WESTERN ELECTRIC CO. v. ANTHRACITE TELEPHONE CO. et al.

(Circuit Court, W. D. Pennsylvania. January 27, 1902.)

1. PATENTS—SUIT FOR INFRINGEMENT—EFFECT OF PRIOR ADJUDICATION.

A circuit court will not hold itself concluded by a decree entered by it in a prior suit adjudging the validity of a patent, although such decree has been affirmed on appeal, where it appears that prior to the hearing in the cause it had ceased to be an adversary proceeding, which fact was unknown to either court.

2. SAME—INVENTION—TELEPHONE APPARATUS.

The Carty patent, No. 449,106, for improvements in telephone circuits and apparatus, construed, and *held* void for lack of patentable novelty, in view of the prior development of the art and the definite prior knowledge by the electrical profession of the principles upon which the invention claimed therein rests, which rendered the combination of devices shown, all of which were old, but the natural outgrowth of such development.

In Equity. Suit for infringement of letters patent No. 449,106, issued March 31, 1891, to John J. Carty for improvements in telephone circuits and apparatus. On final hearing.

George P. Barton and Frederick P. Fish, for complainant.

Charles C. Bulkley and R. S. Taylor, for respondents.

Before ACHESON, Circuit Judge, and BUFFINGTON, District Judge.

BUFFINGTON, District Judge. This is a bill filed by the Western Electric Company against the Anthracite Telephone Company and others, charging infringement of letters patent No. 449,106, now owned by complainant, applied for August 16, 1890, and granted March 31, 1891, to John J. Carty, for telephone circuit and apparatus. This patent has heretofore been considered by the courts of this circuit. In the case of Western Electric Co. v. Millheim Electric Tel. Co. (C. C.) 88 Fed. 505, the patent was held valid in an opinion delivered by Buffington, J. This decree was affirmed by the circuit court of appeals, in an opinion reported in 37 C. C. A. 38, 95 Fed. 152, delivered by Kirkpatrick, J., the remaining members of the court, Acheson and Dallas, JJ., concurring. Later, the present bill was filed, and a preliminary injunction on the adjudged patent sought against the respondents. On hearing such motion, Judge Acheson refused a preliminary injunction in an opinion found at 100 Fed. 301. In addition to other grounds thereto moving the court, including the fact that in the Millheim Case the court had not been required to, and had not in fact, passed upon or defined the scope of the claims, it was there said:

"Enough, however, here appears to justify a refusal of a preliminary injunction unless the adjudication in the Millheim Case is to be considered as conclusive against the defense of prior use at this preliminary stage of the case. But the proofs before the court disclose circumstances connected with that adjudication which, I think, ought to deprive it of such effect. It appears that the American Bell Telephone Company was and is the owner of more than one-half of the capital stock of the Western Electric Company, the plaintiffs in the Millheim Case and in this suit, and that by virtue of

such controlling ownership and also by reason of contract relations between these companies, said two companies were and are jointly interested in this litigation on the Carty patent, their common interest being to sustain the patent. Now it further appears that, pending the suit in the Millheim Case, the local representative of said Bell Telephone Company, acting in the interest of that company, and for it, bought out the Millheim Telephone Company and all its property. The negotiations for this purpose began in January, 1898. The terms of sale were settled on February 10th, and the transaction was consummated by transfer and delivery of possession in March, 1898, when the alleged infringing apparatus was taken out by the Millheim lines and replaced by other apparatus. It seems to me from the evidence that a real controversy between the Western Electric Company and the Millheim Electric Telephone Company no longer existed when the Millheim Case was heard in the circuit court on February 17, 1898. Certainly, there was no such dispute when that court made its decision on July 18, 1898. It may, I think, be affirmed confidently that, if the learned judge who sat in the circuit court had known the facts, he would not have heard or decided the Millheim Case, and that the court of appeals would have dismissed the appeal had the facts been brought to its notice. Lord v. Veazie, 8 How. 251, 12 L. Ed. 1067; Cleveland v. Chamberlain, 1 Black, 419, 17 L. Ed. 93; East Tennessee, V. & G. R. Co. v. Southern Tel. Co., 125 U. S. 695, 8 Sup. Ct. 1391, 31 L. Ed. 853."

Subsequently, much testimony was taken in this case, and it came up for final hearing before Judges Acheson and Buffington. Being fully advised of the facts on such hearing, this court adheres to the view above expressed, that the prior decision of this court, reported at 88 Fed. 505, and affirmed by the circuit court of appeals, is not conclusive in the present case.

As the general nature of telephone party lines and the difference between series and multiple systems are quite fully set forth in the prior opinions, they need not be here detailed at length. Suffice it to say the Carty device is of the multiple circuit construction, and at each station is a permanent bridge, in which is seated a bell magnet, with a high coefficient of self-induction, and of marked impedance. There are also two other bridges, normally open, and closed only when the station is in use. The telephone bridge circuit, normally open, is closed in multiple arc with its own bell magnet, and, of course, with all others in the line, when in use. The generator call circuit, normally open, when used, forms a second bridge or cross connection between the wires in parallel circuit with the bridge circuit of its own bell and those of all others in the line. In operation, the tendency of the call current to short-circuit is counteracted by using a bell magnet of high self-induction and impedance. This not only prevents short-circuiting, but effects a more even current distribution through the bell magnets of the entire system. By means of the numerous windings of the bell magnets, the small portion of the call current passing exerts a marked magnifying effect on the cores and a spirited working of the call signal. Does such combination involve patentable novelty? The solution of this question turns on whether the placing in combination of these elements all of which, individually, were old in the art, involved inventive genius, or was the natural advance incident to the application of electrical engineering skill to the solution of recognized difficulties. In that connection, it will be observed the general principles applicable to series and multiple-arc distribution of currents

were known and utilized prior to Carty's alleged invention, and that in a multiple-arc system the current divided itself among parallel bridges in proportion to their several resistances. Moreover, it was known that by the use of magnets of high impedance certain currents would, and certain would not, be allowed to pass. So also the difference between voice currents and generator call currents in telephoning was appreciated, and the fact that high impedance magnets were opaque to the former, but not to the latter. Now, wherein does the alleged invention lie in Carty's arrangement? We take, as fairly representative of complainant's contention, the statement of Mr. McBerty, an officer of the complainant company and an expert witness by it called:

"The invention of the patent in suit is a many-station or party telephone line, in which the parts, the different signaling and speech transmitting instruments, are so adapted and arranged with relation to each other, both at each and at all of the stations, that they work harmoniously, each without impairing the efficiency of the other. The central idea of the invention is found in the connection of the different instruments in multiple; the parts at each station are connected in multiple at the station, and the different stations are connected in multiple with the line conductors. As this was not possible with the apparatus arranged for serial connection, the different appliances for the substation were also modified by Carty to adapt them to one another in their new relations in the circuit, and, indeed, to make the new arrangement possible; and in the case of the call bell particularly, a new appliance was provided of high resistance and of very high impedance or self-induction. A bell was constructed with long magnets, with more iron than usual, and with a great number of turns of fine wire, the construction resulting in self-induction so great as to prevent the transmission of telephone currents through it in its place in the circuit. The self-induction of a magnet results from the same condition which makes it a magnet and enables it to do work; and here in Carty's invention this quality which, in the series arrangement, had limited the construction of party lines and impaired their usefulness, is taken advantage of, amplified, and utilized to construct a bell which may be connected in a bridge of a telephone circuit without forming a diverting path for telephone currents."

It will thus be seen that according to Mr. McBerty the central idea of the invention was the connection of the different elements in multiple at each station and the different stations in multiple with the line conductors. That is, Carty put each of the three essentials of a station, viz., call, voice, and signal apparatus, in its own bridge, and he placed the station itself in bridge with the line conductors. The serial apparatus of the call and voice apparatus were modified to adapt them to the new multiple relation, and "in the case of the call bell particularly a new appliance was provided, of high resistance and of very high impedance or self-induction." Statements made by Mr. Carty himself both in an address delivered September 9, 1890, at the Detroit convention of the National Telephone Exchange Association, and also in a letter of November 1, 1890, to the London Electrical Review commenting on such address, show wherein he considered his invention did, and wherein it did not, lie. In his judgment at that time it did not lie in bridging. His address was on bridging bells, but bridging he explicitly disavows. He then said:

"We do not want to make any contention for a patent on bridging. Bridging apparatus is not new. It was advocated in a paper read at Minneapolis last year, and one of the first things that Mr. Hibbard did in the

long-distance company was to throw out the looping arrangement and bridge the operators in."

In his letters he says:

"I would call your attention to the fact that, as shown by the official report of the convention proceedings and all published accounts of my remarks, I did not claim any novelty for the bridging system per se, being well aware that it had been in use for years, both in Europe and America."

Wherein his invention did lie, he thus states in the Detroit convention address:

"The bell is on exhibition in the rear of this hall. It is a magnetic bell that is much simpler than any yet designed. There is no bottom contact on it, and the bell rings equally well whether the telephone is on the hook or off. The construction of that bell is very little different from some other bells that are made to do the work, but when you come to use 10 or 15 stations on a line you have got to have exactly that construction, and it is such an important matter to the licensee that we are making great effort to get a patent upon it. In designing that we not only have an idea of our immediate wants, but we aimed to get a bell that we could say would work on any line up to 20 stations."

This view he confirms in another part of his London letter, where he says:

"My invention, however, relates to a specially designed bridging magneto bell, by means of which the talking and signaling on a line containing 20 stations equipped with this bell are equally as good as with a line containing only 2 stations. These results are not attainable with the ordinary form of magneto bell. The details of the construction of my bell were not described by me at the convention, as an application for patent rights was then pending in the United States patent office."

It will be noted that the patent in suit is not for a magneto bell, but for a combination of which such bell is an element. These statements are not here cited as constituting an estoppel as against Carty, but they have an important bearing on the statements in his subsequent testimony claiming a broader scope for his improvement. Moreover, the accuracy of this earlier statement is, we think, supported by other testimony. In testing the alleged patentable novelty of this improvement, the exceedingly rapid development of the art is a factor to be considered. Once it was started, the country was strung with wires with unparalleled rapidity. In this hasty development, attention was naturally first given to city systems provided with exchanges and to long-distance lines uniting large cities. Rural and side lines were of less importance, and naturally problems incident to the lines in and connecting large commercial centers demanded and received the earliest and best telephonic engineering study. Whatever advances were made in these long-distance and exchange systems would naturally be extended later to the development of the less important lines. This reasonable and to be expected course of events we see strikingly exemplified in the present case. But while we naturally look to the exchange and the long-distance line for such development, and in fact find it there existing, the initial development therein made, and the devices used in such systems, were not called to our attention in the Millheim Case. Taking up first the exchange system, we find there in use the operator's cord circuit, shown in the accompanying sketch:

line to Subscriber

Signal T  Drop  Generator

Telephone

Telephone key

Generator  Ringing keys

Operators Circuit

Calling Signal Drop

line to Subscriber

A cord circuit is one of several such fixtures at each operator's table before a switch board in a central office. Its purpose is to connect lines of subscribers for conversation. The method of its use is as follows: At the left of the above sketch is a subscriber's annunciator or calling signal drop. This is in the subscriber's, and not in the operator's, circuit. When the subscriber calls the central operator she plugs into a spring-jack on the board, thus cutting out the calling subscriber's annunciator and connecting her cord circuit with his line. At the center of the cord circuit, and normally disconnected from the line at both terminals, but adapted to be connected by spanning the line, is her telephone. By pressing on buttons above and below, she connected her telephone with both sides of her cord circuit and inquired for the number wanted. Having learned such number, she then inserts the right-hand plug of her cord circuit into the spring-jack of the desired subscriber. At the right of the cord circuit, normally disconnected from the line at both terminals, but adapted to be connected therewith by spanning the line, is a call generator. By pressing the buttons as before she connects the generator with the two sides of the line of the subscriber to be called, and at the same time, by breaking the contacts with the cord circuit lines, she disconnects the remainder of the cord circuit from the generator, and by operating the generator thus sends a call to the desired subscriber alone. She then disconnects the generator and thus restores the contacts between her cord circuit and the line of the subscriber called. In this situation, which is the condition shown in the sketch, the lines of the two subscribers are connected by a continuous line through the cord circuit. But so long as this condition continues, both subscribers are powerless to break their continuous connection and put themselves in a position to communicate with other subscribers. To do this it is apparent that the agency of the central operator must be invoked, and the apparatus by which this is done must be such that, while it is in a permanent permissible operative relation as a signaling apparatus,

it must meanwhile be opaque to the voice currents of the conversing subscribers. Such result was effectively secured by the device in the sketch marked "Signal Drop," and known as a "clearing-out" annunciator. If the electro-magnet which operates the signal drop was of low impedance, the voice current would short-circuit, and conversation would be unsatisfactory; hence one of high impedance was used, and prevented such result. At the same time the signaling current, either an alternating generator current of low frequency or a steady battery one, crosses freely and signals. The use of these signal drops, and the functional effects secured by them, are clearly pointed out by different witnesses. Mr. Dunbar, an expert for respondents, says:

"The disconnecting annunciator was normally bridged across the main wires of the circuit ready to receive a disconnecting signal sent over the line by either of the connected subscribers, and was thus bridged across the two wires of the main line while conversation was taking place between the two subscribers. This disconnecting annunciator was wound to a high resistance and high inductance, so that but little of the telephone current would be shunted or short-circuited through this path, and also so that this disconnecting annunciator would readily respond to the generator currents sent over this same main line from either subscriber's station. These disconnecting annunciators were used to give a visual indication to the operator, by the releasing of a shutter through the agency of an armature attracted by the high-wound magnet of the annunciator. Such visual signals were. of course, better adapted for attracting the attention of the operator at the central office than the bells used at the subscriber's stations to attract the. attention of the subscribers."

Thomas D. Lockwood is an officer of the complainant company, and was called as a witness in its behalf, and acted as attorney for the applicant in preparing the application for and specifications of the patent in suit. He testified in the interference case of Kellogg v. Scribner v. Pickernell, No. 15,754, and his testimony, which Mr. Lockwood discussed when called as a witness in the present case, is quoted by Mr. Dunbar, as follows:

"Interrogatory 185. When did you first know of the use in any switch board of annunciators whose cores were wound to a resistance of 500 ohms, and when, if ever, were coils of that description used in the Boston board, and when, if they were, and you know, was it determined to use such coils in that board? A. I suppose that although the resistance of 500 ohms precisely is mentioned in the question, that figure as there given means virtually any high resistance for such annunciators,—say between 400 and 1,000 ohms, —and I will answer accordingly. The first case of which I know is that of the Paris exchange, and I knew of this in 1884. The resistance of the annunciators was about 400 ohms. Later, when metallic circuit switch boards were adopted in this country and used on a large scale, the first instance being the Cortlandt street, New York, exchange switch board, it became evident very shortly after that switch board was put in operation that talking was unduly weakened by having clearing-out annunciators in the talking circuit formed of any two lines, and that if clearing-out annunciators were to be used or retained in use they must be placed in a bridge or in a branch to earth (the latter in the case of grounded lines); and to the end that when so placed in bridge or branch circuit they would not carry off a large portion of the talking current to the detriment of the distant telephone, they must be made of high resistance."

Mr. Pickernell, also an officer of the complainant company, says:

"Experimental drops of high resistance were first used some time subsequent to April 8, 1889. The high resistance bridging drop at toll boards was adopted in the summer of 1889."

The significance of the relation of this prior structure to Carty's apparatus will be seen from the following considerations: It shows the prior use for signaling of a magnet of such high impedance and inductance as to make it opaque to voice currents; such magnet is placed in bridge; the call mechanism, as well of the subscribers as of the central operator, was not in series with the signaling apparatus of the cord circuit. That these signals were visible instead of audible is a matter of mechanical detail; that they were used to end a conversation, and not to open it, makes no difference in principle. They show the use for signaling of a high impedance bell, opaque to voice currents and in bridge.

We also find in the prior art the apparatus used for signaling intermediate stations of long-distance lines, and shown in the accompanying sketch:

Such intermediate station had a drop or signaling bell permanently bridged on the line. It was used to signal the station operator, so that connection could be made with a local subscriber. Being in constant normal operative relation it stood ready for use when needed, but being of high impedance and self-induction it was opaque to the voice currents passing between the principal stations. The cord circuit of the local operator formed the remainder of her set. When the operator was signaled, she plugged into the line, and that brought her cord circuit with its telephone and generator into operative connection with the line. It will be noted the telephone was out of connection with the line as in the Carty device. The operator in the long-distance station brought it in by pressure on buttons or the like, while in Carty's device it was brought in by the subscriber removing it from the hook. These differences were merely mechanical, as were also those incident to the generator. Both were normally disconnected; when in use both were in bridge. The functions of this device and its use prior to the Carty patent are shown in the testimony of Mr. Pickernell, who says:

"High resistance magnets were first used at intermediate stations some time after November 14, 1899. I can't state just how long after it was. I find that on November 14th I advised the manufacturer of the magnets

for the use at intermediate stations that the sample that was then submitted to my approval was defective, and I returned this sample on that date for correction. It probably took several days to correct the sample, and probably several weeks to manufacture a lot of bells."

The witness further testified in reference to the foregoing sketch that the bell or drop marked "A" was of high resistance and high self-induction; that it was used for signaling an operator at an intermediate station (as a line signal); that "this drop was made of high resistance and high self-induction so as to prevent the passage or shunting of the telephone current when the circuit was used for transmitting speech between the terminal stations." The proofs established these facts: The signaling bells were of high impedance and high self-induction; they were mounted in bridge; they were in bridge alone; they were used for initial signaling,—conditions akin to those of Carty's system. Indeed, that the whole telephonic art was in a state of rapid but regular development; that the two devices described were the natural outgrowth of such progress; and that Carty's device was one of the regular steps of such advance when party lines came to receive their due share of skilled electrical attention,—is clear. Some phases of such development are shown in the public addresses made by Messrs. Pickernell, Hibbard, and Carty, their testimony, and the part they bore in such advance. These three trained electrical engineers were all in the employment of one company, and engaged in the introduction of long-distance lines in the East. They joined in the preparation of a paper entitled "New Era in Telephony," read before the Minneapolis convention of the National Telephone Exchange Association, held September 11, 1899, and composed of electrical experts. The substitution for grounded lines of metallic circuits constituted the "new era" to which the paper referred. To this change and its attendant problems the highest electrical thought was given, and the change naturally caused many advances in constructive and operative methods. Among other elements was the multiple party line. This paper, which is printed in full in the Western Electrician of September 21, 1899, after discussing the advantages of metallic circuits, refers to the subject of party lines as follows:

"With the extension of metallic circuits it is often asked how they may be utilized for the service of two or more subscribers on the same circuit. Probably the best results are accomplished by bridging the different instruments onto the two sides of the metallic circuit, using a ringer magnet at each instrument of high resistance and retardation. By this arrangement the electrical balance is preserved, and no alteration in the ordinary form of operating apparatus is made necessary. It has been the practice heretofore to loop intermediate sets of instruments into a circuit. At first this practice was persisted in when metallic circuits were introduced, additional instruments being looped into one side of the circuit. Such an arrangement, however, destroys the balance, and the instrument so connected will be subject to disturbance as loud as the line is capable of producing, and it will also be a source of disturbance to the other instruments in the circuits. By connecting all instruments, however, in multiple arc, bridging across the circuit, nothing is lost in transmission, if the coils have sufficient retardation, and the electrical balance necessary to the proper working of the system is preserved."

The disclosures of these three trained men to their fellow electricians are important in this case. The long-distance lines with which they were associated represented the highest state of the art. The high impedance electro-magnet was long before known. Mr. Lockwood, in the interference case quoted elsewhere, says:

"But as early as 1884 it was seen that by properly placing the retardation coils, or coils which inclosed or were inclosed by iron in or in relation to telephone circuits, this impedance, which theretofore had been an unalloyed evil, might be made useful by causing it, in complicated systems of telephone circuits, to guide telephonic currents into routes where they were desired, and to prevent them from passing into portions of the systems of circuits where they were not desired. * * *"

But while its theoretical capacity was known, it was now being put into practical use in these metallic circuits in clearing-out drops and line annunciators. It nowhere appears that these magnets had been applied to any metallic circuit multiple party lines for individual subscribers, or, indeed, that any such lines existed. But these men, from their experience with the metallic circuits of the new era, were so confident of the possibility of applying to party lines the same general practices they had tested on the long-distance lines that they felt even then justified in confidently defining to their fellow engineers the means by which the party line problem would be worked out. At that very time they were in the midst of the advance. Mr. Pickernell says:

"Experimental drops of high resistance were first used some time subsequent to April 8, 1889. The high-resistance bridging drop at toll boards was adopted in the summer of 1889."

It is true he also says:

"High resistance magnets were first used at intermediate stations some time after November 14, 1889. I look upon the paper entitled a 'New Era in Telephony,' prepared by Messrs. Carty, Hibbard, and myself, as being in the nature of a prophecy, for I am certain that the high resistance magnets were not used prior to the above date."

But the importance of the disclosure is increased, not lessened, by the fact that it was a prophecy. The subsequent successful application of the general principles of the disclosures to successfully signal intermediate stations shows the importance and the truth of the prophecy. Now, it seems to us that the Minneapolis instructions were the lines along which Carty subsequently worked, but the way was clearly pointed out by the joint article of the three men. Mr. McBerty, as we have seen, says, "The central idea of the invention is found in the connection of the different instruments in multiple;" but this was but carrying out the Minneapolis instruction. The broad principle was embodied in the cord circuit and the long-distance intermediate station, both of which are clearly shown by the proofs to have been in use prior to Carty's alleged invention. The application of this principle to party lines lay in engineering skill, not inventive genius. Hibbard's work concerned the improvement of ringer drops, while Carty's concerned party lines. Hibbard says:

"I was interested at that time in the development of the bridging drop, and bridging bells were first put into operation by others. * * * In this article the methods which had experimentally been found to be the best up to that time for long-distance work were recommended for local work. * * * The plan of bridging the ringers was proposed, I think, by Mr. Carty."

In view of the quite explicit directions for bridging embodied in this article, and in view of the successful use of magnets of high resistance and self-induction in the cord circuit and long-distance station, there would seem to be little question but that any one of these trained engineers if directed to correct the recognized evils of party line systems would have done so in the same engineering lines followed by Carty. If in carrying out these broader general principles he invented, as he said in his London letter, "a specially designed bridging magneto bell," he was entitled to patent protection therefor, but the invention of such a bell did not warrant him laying claim to the broad principle of connecting the different instruments in multiple. In view of the prior development of this art evidenced by the devices to which we have referred in detail, and the definite prior knowledge of the electrical profession of the principles of bridging, multiple construction, and the use of magnets of high impedance and self-induction for signaling purposes, and to prevent the shunt and loss of voice currents, we are of opinion that the combination shown in Carty's patent involved no patentable novelty. Such conclusion is not at variance with the opinion in the Millheim Case, 88 Fed. 509, or of the circuit court of appeals. Those cases were rightly decided on the facts before the courts, but the actual state of the art was not then called to the court's attention. It was there found that every element of Carty's device was, in itself and individually, considered old. The novelty lay in their combination; for it was not shown any such combination had been made before. It was said:

"The call signaling apparatus of the Carty system is so vital to its use that either it or its substantial equivalent should be found in the alleged anticipation to constitute it a real anticipation."

We now find that there were in existence in the clearing-out drops and the signaling apparatus of the long-distance lines, such application of the principles on which Carty's combination rests that their application to party lines was but the natural and to be expected advance in the progressive art to which they appertained. To use, with some changes, the language of another (Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438), we may say that the development of this, as of every great industry, has developed a constant demand for new appliances, which the ordinary skill of those versed in such branch has generally been adequate to devise, and which devising is the natural outgrowth of such development. Each forward step prepares the way for another, and to burden a great industry with a monopoly to each improver for every step thus made, except where marked by an advance greater than mere engineering skill, is unjust in principle and hostile to progress. As our conclusion that the Carty patent is invalid for lack of patentable invention goes to the root of the case and is decisive against the complainant, we

do not think it necessary for us to discuss or pass on the other serious defenses to this bill, namely, the defense of prior use at Crown Point and Merrillsville, Ind., and on the Wilmington Coal line in Chicago, and the defense of noninfringement.

ACHESON, Circuit Judge (concurring). The final hearing of this case took place at Pittsburg, and at my request Judge BUFFINGTON sat with me, and has prepared the opinion of the court which I file herewith. I fully concur in the views Judge BUFFINGTON has expressed, and accordingly a decree will be entered dismissing the bill of complaint, with costs to the defendants.